UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TAYA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV1306JCH(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>REPORT AND RECOMMENDATION</u>
<u>OF UNITED STATES MAGISTRATE JUDGE</u>

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Taya Smith for Supplemental Security Income under Title XVI of the

Social Security Act. The cause was referred to the undersigned United States Magistrate Judge

for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in

Support of the Complaint. (Document Number 15). Defendant has filed a Brief in Support of the

Answer. (Doc. No. 21).

<u>Procedural History</u>

On November 26, 2007, plaintiff filed her application for benefits, claiming that she

became unable to work due to her disabling condition on September 21, 2007. (Tr. 38-41). This

claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated January 23, 2009. (Tr. 29, 15-28).

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on June 10, 2010. (Tr. 10, 3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on November 6, 2008. (Tr. 313). Plaintiff was present and was represented by counsel. (Id.). Vocational expert Susan Shay was present by telephone. (Id.).

The ALJ examined plaintiff, who testified that she lived with her husband and three children in an apartment in Park Hills. (Tr. 315). Plaintiff stated that she has two sons who are thirteen and eleven years of age, and one daughter who is nine years of age. (Id.). Plaintiff testified that she has lived in the apartment for about four years. (Id.). Plaintiff stated that she was thirty-two years of age. (Tr. 316). Plaintiff testified that she was five-feet, three-inches tall and weighed 226 pounds. (Id.). Plaintiff stated that she was right-handed. (Id.).

Plaintiff testified that her husband drove her to the hearing. (Id.). Plaintiff stated that her apartment is located on the first floor of the apartment complex. (Id.). Plaintiff testified that she does not have to climb steps to reach her apartment. (Id.). Plaintiff stated that her apartment is two levels but her bedroom is downstairs. (Id.).

Plaintiff testified that she received child support from her first husband. (Id.). Plaintiff stated that she also received Temporary Assistance for Needy Families (TANF). (Id.). Plaintiff stated that she received food stamps in the amount of $698.00 a month. (Tr. 317). Plaintiff stated that she also received Medicaid benefits. (Id.).

Plaintiff testified that she was injured on the job and filed a Workman's Compensation claim in January 2001, when she was working as a nurse's aide. (Id.). Plaintiff stated that she was transferring a resident from a wheelchair to a bed when the resident jumped, causing her to fall to the floor. (Id.). Plaintiff testified that she was injured as a result of this incident and went to the hospital to receive treatment. (Id.). Plaintiff stated that she received a settlement in the amount of approximately $5,000.00. (Tr. 318).

Plaintiff testified that she does not remember if she ever collected Unemployment Benefits. (Id.).

Plaintiff stated that she recently received a high school diploma through an online education class. (Id.). Plaintiff testified that she is licensed as a CNA. (Id.). Plaintiff stated that she is also licensed as a CMA, which authorizes her to dispense medication. (Id.). Plaintiff testified that she is able to read and write. (Tr. 319).

Plaintiff stated that she was not working at the time of the hearing. (Id.). Plaintiff testified that she last worked in 2003. (Id.). Plaintiff stated that she was able to work for about two years after her accident. (Id.). Plaintiff testified that she was terminated from her position on March 31, 2003, because her employer thought she was missing too much work. (Id.). Plaintiff stated that she was working full-time for Kelly's Corner Cupboard at that time, which is a grocery store. (Id.). Plaintiff testified that she was a store clerk at this position. (Id.). Plaintiff stated that she worked at this position for about one year. (Tr. 320). Plaintiff testified that she stocked shelves, carried boxes, unloaded trucks, and cleaned at this position. (Id.). Plaintiff stated that she lifted boxes weighing fifty to sixty pounds. (Id.).

Plaintiff testified that she was hospitalized due to back problems. (Id.). Plaintiff stated

that she injured her back in the work accident and she never recovered. (Id.). Plaintiff testified that she received epidural injections, went to physical therapy, and took steroids, anti-inflammatories, and pain medications. (Id.). Plaintiff stated that her condition worsened with time and the pain was so severe that she was hospitalized. (Tr. 321). Plaintiff testified that she was hospitalized for three days, during which her pain was controlled. (Id.). Plaintiff stated that she returned to work when she was released but ended up missing more work due to her condition. (Id.). Plaintiff testified that her supervisor eventually terminated her for missing too much work. (Id.).

Plaintiff stated that she has applied for jobs since she was terminated in March 2003. (Tr. 322). Plaintiff testified that she tried to obtain another job distributing medication. (Id.). Plaintiff stated that she also tried to obtain restaurant work. (Id.). Plaintiff testified that she tried to obtain a position at Parkland Hospital but did not get the position. (Id.). Plaintiff stated that she was unable to get a position at another nursing home because all the nursing homes in the area are owned by the same company and her former employer told them not to hire her. (Tr. 323). Plaintiff testified that she was never offered employment. (Id.).

Plaintiff stated that in the past fifteen years, she has worked as a cashier, a manager, and a nurse's aide. (Id.). Plaintiff testified that she started working as a cashier in a restaurant and advanced to the position of manager. (Tr. 324). Plaintiff stated that she worked at the restaurant-Bob's Seafood and Grill-for almost two years. (Id.). Plaintiff testified that, as a manager, she did inventory, kept the books, made night deposits, and oversaw employees. (Id.). Plaintiff stated that she did the interviewing and the firing but did not do the hiring. (Id.). Plaintiff testified that as a manager and cashier, she unloaded trucks. (Id.). Plaintiff stated that

she lifted boxes of fish weighing up to seventy pounds at this position. (Tr. 325).

Plaintiff testified that she obtained her CNA license when she was eighteen and worked as a CNA until 2002. (Tr. 326). Plaintiff stated that this was heavy work because she had to lift patients. (Id.).

Plaintiff testified that she usually wakes up at 5:30 a.m. and helps her children get ready for school. (Id.). Plaintiff stated that her children leave for school between 6:30 and 6:50 a.m. (Id.).

Plaintiff testified that her husband is a truck driver but he has not been working. (Tr. 327). Plaintiff stated that her husband has been taking care of her and the children. (Id.). Plaintiff testified that her husband does more household chores than she does. (Id.).

Plaintiff stated that, after her children leave for school, she takes her medication, tries to eat, and then lies down because her medication makes her drowsy. (Id.). Plaintiff testified that she usually lies down for one to two hours, depending on whether she is having a good day or a bad day. (Id.). Plaintiff stated that when she wakes up, she usually showers and dresses. (Id.). Plaintiff testified that her husband helps her step into the tub because she often feels dizzy due to her seizure medication. (Id.). Plaintiff stated that she has grab bars in her shower but does not have a shower stool. (Tr. 328). Plaintiff testified that after she gets dressed, she sits and watches television. (Id.). Plaintiff stated that her husband does the laundry and brings her clothes to fold while she sits on the couch. (Id.). Plaintiff testified that her husband then puts the clothes away. (Id.).

Plaintiff stated that she does not watch a lot of television but she likes to read. (Id.). Plaintiff testified that she reads Steven King books and art books that her husband gets online.

(Id.).

Plaintiff stated that she does not cook other than heating meals in the microwave. (Id.). Plaintiff testified that her husband cooks all major meals because she is unable to stand at the stove for very long. (Id.).

Plaintiff stated that she is unable to do laundry. (Tr. 329). Plaintiff testified that she is able to wash dishes for a while but is unable to finish the task. (Id.). Plaintiff stated that she is able to make her bed but is not able to change the sheets. (Id.). Plaintiff testified that she is unable to vacuum, mop, or sweep, and that her husband performs these chores. (Id.). Plaintiff stated that her husband shops for groceries and that she seldom accompanies him. (Id.). Plaintiff testified that if she goes with her husband to the grocery store, she waits in the car. (Id.).

Plaintiff stated that she does not have a social life. (Tr. 330). Plaintiff testified that she characterizes herself as unsociable. (Id.). Plaintiff stated that she gets along with her husband and children. (Id.). Plaintiff testified that she does not get along with her mother. (Id.). Plaintiff stated that she does not know any of her neighbors and that she does not speak to them. (Id.). Plaintiff testified that she belongs to a Catholic church but she does not participate in any church ministries. (Id.). Plaintiff stated that, in the evenings, she sits with her children and helps them with their homework. (Tr. 331). Plaintiff testified that she never goes out at night or on the weekends. (Id.). Plaintiff stated that reading is her only hobby. (Id.).

Plaintiff testified that she does not drive because her doctors have advised her against driving due to the seizures she experiences. (Id.). Plaintiff stated that she does have a driver's license. (Id.). Plaintiff testified that she last drove approximately two years prior to the hearing. (Id.). Plaintiff stated that she takes medication for her seizures. (Tr. 332). Plaintiff testified that

her seizures had been stable with medication but she is now at a non-therapeutic level.  (Id.).

Plaintiff stated that she takes her medication as prescribed and that her doctor recently increased

her dosage.  (Id.).

Plaintiff testified that she sits outside on her front porch for short periods when it is nice

outside.  (Id.).  Plaintiff stated that she does not ever go fishing or camping.  (Id.).

Plaintiff testified that she quit smoking a week prior to the hearing.  (Id.).  Plaintiff stated

that she was smoking about two packages of cigarettes a day before she quit.  (Id.).

Plaintiff testified that she does not drink or do any illegal drugs.  (Tr. 333).  Plaintiff stated

that she has never had a drinking problem.  (Id.).

Plaintiff testified that she takes Prevacid for acid reflux disease.[1]  (Id.).

Plaintiff stated that she takes 200 milligrams of Tegretol[2] three times a day for seizures.

(Tr. 334).  Plaintiff testified that she last had a seizure a few minutes prior to the hearing.  (Id.).

Plaintiff stated that it was a petit mal seizure.[3]  (Id.).  Plaintiff testified that she has had grand mal

seizures[4] and that she last had one about a month prior to the hearing.  (Id.).  Plaintiff stated that

---

[1]Regurgitation of the contents of the stomach into the esophagus, possibly into the pharynx where they can be aspirated between the vocal cords and down into the trachea; symptoms of burning pain and acid taste result.  Stedman's Medical Dictionary, 1664 (28th Ed. 2006).

[2]Tegretol is indicated for the treatment of epilepsy.  See Physician's Desk Reference (PDR), 3019 (63rd Ed. 2009).

[3]Obsolescent term for a cerebral seizure not manifested by tonic-clonic movements (i.e. grand mal).  Stedman's at 1744.

[4]A generalized seizure characterized by the sudden onset of tonic contraction of the muscles often associated with a cry or moan, and frequently resulting in a fall to the ground.  The tonic phase of the seizure gradually give way to clonic convulsive movements occurring bilaterally and synchronously before slowing and eventually stopping, followed by a variable period of

she was at home when she had the grand mal seizure and she lost control of her bodily functions and bit her tongue.  (Id.).  Plaintiff testified that her doctor recently increased the dosage of her seizure medication.  (Tr. 335).

Plaintiff stated that she takes Topamax[5] to control her seizures and her migraine headaches.  (Id.).  Plaintiff testified that she experiences migraine headaches at least once or twice a week.  (Id.).  Plaintiff stated that her migraines last between one and three days.  (Id.).  Plaintiff testified that she also takes over-the-counter medication when she has a migraine.  (Id.). Plaintiff stated that she takes 400 milligrams of Dilantin[6] at night for the seizures.  (Id.). Plaintiff testified that she takes Cymbalta[7] for depression.  (Tr. 336).

Plaintiff stated that she takes Diovan[8] for high blood pressure.  (Id.).  Plaintiff testified that she checks her blood pressure three times a day every day.  (Id.).  Plaintiff stated that her blood pressure is not under control.  (Id.).  Plaintiff testified that she was undergoing outpatient surgery the day after the hearing to have a stent put in her kidney to help control her blood pressure. (Id.).

Plaintiff stated that she also plans to undergo a cardiac catheterization due to blockage in her heart.  (Id.).  Plaintiff testified that she experienced chest pain.  (Id.).  Plaintiff stated that she

_____

unconsciousness and gradual recovery.  Stedman's at 1744.

[5]Topamax is indicated for the treatment of epilepsy.  See PDR at 2431.

[6]Dilantin is indicated for the treatment of seizures.  See WebMD, http://www.webmd.com/drugs (last visited July 26, 2011).

[7]Cymbalta is indicated for the treatment of major depressive disorder.  See PDR at 1801.

[8]Diovan is indicated for the treatment of hypertension and heart failure.  See PDR at 2212.

takes aspirin for her heart.  (Tr. 337).

Plaintiff testified that she takes Xanax[9] for anxiety and insomnia.  (Tr. 337).  Plaintiff stated that the Xanax "sometimes" works.  (Id.).

Plaintiff testified that she takes Percocet[10] for arthritis pain.  (Id.).  Plaintiff stated that she has arthritis in her hands, wrists, shoulders, elbows, back, and neck.  (Id.).  Plaintiff testified that she is in constant pain.  (Id.).  Plaintiff stated that her pain level during the hearing was a seven.  (Id.).  Plaintiff testified that she took Percocet prior to the hearing.  (Id.).  Plaintiff stated that her pain was starting to improve.  (Id.).  Plaintiff testified that when the Percocet really works, her pain is at a level four.  (Tr. 338).

Plaintiff stated that she uses Clobetasol,[11] which is a cream for her psoriasis.[12]  (Tr. 338).

Plaintiff testified that she takes Atenolol[13] for her high blood pressure.  (Id.).

Plaintiff stated that she takes Singulair[14] for her asthma.  (Id.).  Plaintiff testified that she has had asthma for three or four years.  (Id.).  Plaintiff stated that she has never gone to the

---

[9]Xanax is indicated for the treatment of anxiety and panic disorders.  See WebMD, http://www.webmd.com/drugs (last visited July 26, 2011).

[10]Percocet is indicated for the relief of moderate to moderately severe pain.  See PDR at 1127.

[11]Clobetasol is a topical corticosteroid indicated for short-term topical treatment of the inflammatory and pruritic manifestations of dermatoses of the scalp and for plaque-type psoriasis of non-scalp regions.  See PDR at 3061.

[12]A common multifactorial inherited condition characterized by the eruption of circumscribed, discrete and confluent, reddish, silvery-scaled maculopapules; the lesions occur predominantly on the elbows, knees, scalp, and trunk.  Stedman's at 1594.

[13]Atenolol is indicated for the treatment of high blood pressure.  See WebMD, http://www.webmd.com/drugs (last visited July 26, 2011).

[14]Singulair is indicated for the treatment of asthma.  See PDR at 2117.

emergency room due to an inability to breathe.  (Id.).  Plaintiff testified that environmental

allergies and certain fragrances aggravate her asthma.  (Id.).  Plaintiff stated that cigarette smoke

aggravated her asthma, which is one reason she quit smoking.  (Tr. 339).

Plaintiff testified that she takes Mobic,[15] an anti-inflammatory, for her arthritis.  (Id.).

Plaintiff stated that this medication is not effective, and that her doctor has advised her to stop

taking it.  (Id.).  Plaintiff stated that her doctors indicated that stopping Mobic could also help

lower her blood pressure.  (Id.).

Plaintiff testified that she takes Lisinopril[16] for her blood pressure.  (Id.).

Plaintiff stated that she takes Imuran,[17] a pain medication and anti-inflammatory, for her

arthritis.  (Id.).

Plaintiff testified that she takes 800 milligrams of prescription Motrin as needed.  (Tr.

340).  Plaintiff stated that she takes the Motrin in between doses of Percocet if the Percocet does

not control her pain.  (Id.).

Plaintiff testified that she has an Albuterol[18] inhaler and a nebulizer machine that she uses

as needed for her asthma.  (Id.).

---

[15]Mobic is a non-steroidal anti-inflammatory drug indicated for the treatment of
osteoarthritis.  See PDR at 865.

[16]Lisinopril is indicated for the treatment of hypertension.  See PDR at 2088.

[17]Imuran is an immunosuppressant indicated for the treatment of severe rheumatoid
arthritis in patients who have not responded to other medications.  See WebMD,
http://www.webmd.com/drugs (last visited July 26, 2011).

[18]Albuterol is indicated for the treatment or prevention of bronchospasm.  See PDR at
3114.

Plaintiff stated that she was getting ready to start IV infusions of Remicade,[19] a chemotherapy medication, for her rheumatoid arthritis because other injections have not been effective and her arthritis is severe and progressive.  (Tr. 341).  Plaintiff testified that, at the time of the hearing, she was relying on Percocet to control her arthritis pain.  (Id.).

Plaintiff stated that she was recently prescribed Clonidine,[20] which is a blood pressure medication that also helps stabilize her moods.  (Id.).

Plaintiff testified that she has patellofemoral syndrome in her knees.  (Tr. 342).  Plaintiff stated that she has seen Dr. Maynard, an orthopedic surgeon, for this condition.  (Tr. 342).  Plaintiff testified that Dr. Maynard wants to do arthroplasty on her knees but she declined surgery because it would require surgical procedures every three to four months.  (Id.).  Plaintiff stated that her knees pop and she has a lot of problems with them.  (Tr. 343).

Plaintiff testified that her hands are sore and swollen.  (Id.).  Plaintiff stated that she has difficulty writing, zipping, and buttoning.  (Id.).  Plaintiff testified that she is able to feed herself.  (Id.).  Plaintiff stated that she is "sometimes" able to comb her hair and put on her socks and shoes, depending on whether she is having a good day or bad day.  (Id.).

Plaintiff testified that she has an enlarged heart and leaking valves.  (Id.).  Plaintiff stated that she has undergone echocardiograms and cardiac stress tests.  (Id.).  Plaintiff testified that she plans to undergo cardiac catheterization to determine whether surgery is necessary.  (Id.).

Plaintiff stated that she takes Cymbalta for depression.  (Tr. 344).  Plaintiff testified that she does not want to go anywhere and cries a lot due to the depression.  (Id.).  Plaintiff stated that

---

[19]Remicade is indicated for the treatment of rheumatoid arthritis.  See PDR at 954.

[20]Clonidine is indicated for the treatment of hypertension.  See PDR at 843.

on some days, she does not want to get out of bed.  (Id.).

Plaintiff testified that she also suffers from anxiety and that she has frequent anxiety attacks.  (Id.).  Plaintiff stated that she has also experienced panic attacks.  (Id.).  Plaintiff testified that her husband called an ambulance when she experienced a panic attack about a year prior to the hearing.  (Tr. 345).  Plaintiff stated that she was taken to the hospital but was not admitted.  (Id.).  Plaintiff testified that she has never been in a mental hospital.  (Id.).  Plaintiff stated that she is no longer under the care of a mental health professional.  (Id.).  Plaintiff testified that she used to see a counselor but stopped seeing her because she felt the counselor accused her of being prejudiced.  (Tr. 346).

Plaintiff stated that she has experienced suicidal thoughts but has never made a suicide attempt.  (Id.).  Plaintiff testified that she thinks of her children when she becomes suicidal and the suicidal thoughts go away.  (Id.).

Plaintiff stated that she does not know whether she has experienced hallucinations, although she has occasionally wondered if she did.  (Id.).

Plaintiff testified that her concentration is not very good.  (Id.).  Plaintiff stated that she loses focus of things quickly and has difficulty finishing tasks.  (Id.).

Plaintiff testified that she occasionally experiences difficulty sitting in a chair.  (Tr. 347).  Plaintiff stated that she is able to stand for no longer than five minutes, walk less than a block, and lift less than a gallon of milk.  (Id.).  Plaintiff testified that she is unable to bend, stoop, crouch, kneel, crawl, or climb stairs.  (Tr. 347-48).

Plaintiff's attorney next examined plaintiff, who testified that her seizures have worsened since she last testified at an administrative hearing.  (Tr. 348).  Plaintiff stated that she experiences

frequent grand mal and petit mal seizures. (Id.). Plaintiff testified that she experienced two petit mal seizures the day prior to the hearing. (Tr. 349). Plaintiff stated that she has been having petit mal seizures every day for about two years. (Tr. 349-50). Plaintiff testified that she had a seizure prior to the hearing. (Id.). Plaintiff stated that she sometimes has some warning that the seizure is about to occur but other time does not. (Id.). Plaintiff testified that she usually experiences about four petit mal seizures a day. (Tr. 350). Plaintiff stated that she does not know how long each seizure lasts. (Id.).

Plaintiff testified that the time it takes her to recover from a seizure and continue the activity she was doing prior to the seizure varies. (Id.). Plaintiff stated that it usually takes her ten to fifteen minutes after she has a seizure to resume her activities. (Tr. 351). Plaintiff testified that she usually wants to lie down and sleep after experiencing a seizure. (Id.).

Plaintiff stated that she spends three to four hours on average lying down during the day due to seizures or her other impairments. (Id.). Plaintiff testified that the majority of this time she is lying down to recover from seizures. (Id.). Plaintiff stated that she was experiencing difficulty during the hearing due to her recent seizure in the waiting room. (Tr. 352). Plaintiff testified that she felt drained and wanted to sleep. (Id.). Plaintiff stated that she usually sleeps for hours after having a seizure. (Id.).

Plaintiff testified that the increase in her seizures is the most significant difference in her condition from the time of her prior hearing. (Id.). Plaintiff stated that her arthritis and swelling has also worsened. (Id.). Plaintiff testified that her ability to do many physical things such as write, cook, lift, and walk has decreased. (Id.). Plaintiff stated that she is only able to walk a short distance. (Id.). Plaintiff testified that she experiences pain that shoots down to her feet and

ankles.  (Id.).  Plaintiff stated that her hands and feet are becoming deformed due to the arthritis.

(Id.).

Plaintiff's attorney noted that plaintiff appeared to have a skin problem on her hands.  (Tr.

353).  Plaintiff testified that she had psoriatic arthritis.[21]  (Id.).  Plaintiff's attorney noted that

plaintiff had three to four spots on her right hand and one spot on her left hand.  (Id.).  Plaintiff

testified that these spots hurt and they swell.  (Id.).  Plaintiff stated that she experiences increased

difficulty extending her fingers when her fingers are swollen.  (Id.).  Plaintiff testified that she also

has this skin reaction on her elbows, knees, feet, and ankles.  (Id.).

Plaintiff stated that the amount she is able to sit and read a book varies.  (Tr. 354).

Plaintiff testified that she did not know whether she was capable of reading a book for an hour.

(Id.).  Plaintiff noted that she has frequent seizures and loses track of the time.  (Id.).

Plaintiff testified that she does not believe she is capable of performing any of the jobs for

which she previously applied or worked.  (Id.).  Plaintiff stated that her position distributing

medication required her to use her hands to open pills and write in charts.  (Tr. 355).  Plaintiff

testified that she experiences pain in her hands, which makes it difficult to take her own

medication.  (Id.).  Plaintiff stated that she would be unable to use her hands at a position that

would require her to dispense medications.  (Id.).

Plaintiff testified that she would be unable to operate a cash register or make change for an

eight-hour day.  (Id.).  Plaintiff stated that she is unable to use her home computer.  (Id.).

Plaintiff testified that she did not take online courses.  (Id.).  Plaintiff explained that she ordered

---

[21]The concurrence of psoriasis and polyarthritis, resembling rheumatoid arthritis but
thought to be a specific disease entity, seronegative for rheumatoid factor and often involving the
digits.  Stedman's at 160.

books online and that it took her three years to obtain her diploma rather than one year. (Tr. 356). Plaintiff testified that she would be unable to operate a cash register or keyboard for an extended period of time due to the arthritis in her hands. (Id.). Plaintiff stated that she experienced pain and swelling in her hands at the time of the hearing. (Id.).

The ALJ then examined the vocational expert, Susan Shay, who testified that plaintiff has performed the following positions: cashier, which is light and semiskilled; restaurant manger, which is light and skilled, but medium to heavy as performed by plaintiff; and nurse's aide, which is semiskilled and medium, but heavy as performed by plaintiff. (Tr. 358). The ALJ asked Ms. Shay to assume a hypothetical individual with the following limitations: capable of performing the exertional demands of sedentary work; occasional climbing, balancing, stooping, crouching, kneeling, and crawling; no exposure to ladders, ropes, scaffolds, moving machinery or unprotected heights; and no concentrated exposure to extreme cold, vibration, dust, fumes, gasses and chemicals. (Tr. 359). Ms. Shay testified that the only transferable work skill would be general management skills from plaintiff's management position. (Id.). Ms. Shay stated that these skills would be transferable to a sedentary level. (Id.). Ms. Shay testified that these restrictions would affect the performance of plaintiff's past relevant work. (Id.). Ms. Shay stated that the individual would be able to perform other jobs, such as that of machine feeder (3,900 jobs in Missouri); hand worker (1,500 jobs in Missouri); call out operator (700 jobs in Missouri), and receptionist (970 jobs in Missouri). (Id.).

Plaintiff's attorney next asked Ms. Shay to assume the same hypothetical claimant but that person has lost the ability to use her hands and experiences difficulty extending her fingers such that she would be unable to use them on a consistent basis. (Tr. 360). Ms. Shay testified that this

limitation would preclude any of the work that she discussed.  (Id.).

Plaintiff's attorney then asked Ms. Shay whether a person who was absent from work for more than four days a month would be able to work.  (Id.).  Ms. Shay testified that this limitation would preclude competitive employment.  (Id.).

Ms. Shay testified that a need to take eight to ten unscheduled rest breaks of varying length during the day would preclude competitive employment.  (Tr. 361).

Ms. Shay next testified that an individual who lacked the capacity to sit or stand and walk for more than two hours during a regular eight-hour day would be unable to work.  (Id.).

Finally, Ms. Shay testified that an individual who was experiencing pain that frequently interfered with her ability to maintain attention and concentration to perform even simple work tasks would be unable to perform the positions she previously cited.  (Id.).

**B.    Relevant Medical Records**

Plaintiff underwent an MRI of the lumbar spine on July 10, 2006, which was normal.  (Tr. 175-76).

The record reveals plaintiff saw Laurence Lum, D.O. for various complaints on approximately a monthly basis from August 2006 through July 2008.  On August 22, 2006, Dr. Lum diagnosed plaintiff with GERD,[22] history of pulmonary insufficiency, chest pain, and shortness of breath.  (Tr. 161).   He prescribed Ambien[23] and Percocet and recommended that plaintiff undergo an echocardiogram.

---

[22]A syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus.  Stedman's at 556.

[23]Ambien is indicated for the short-term treatment of insomnia.  See PDR at 2692.

Plaintiff underwent an echocardiogram on September 13, 2006, which revealed mildly enlarged left atrium, trace of aortic regurgitation,[24] mild mitral regurgitation[25] and mild tricuspid regurgitation.[26] (Tr. 174).

On November 20, 2006, Dr. Lum diagnosed plaintiff with chronic sinusitis,[27] rhinitis,[28] and COPD.[29] (Tr. 163). On December 19, 2006, plaintiff complained of migraines and Dr. Lum diagnosed plaintiff with COPD and hypertension. (Tr. 164). Dr. Lum indicated that plaintiff's migraines may result from her blood pressure. (Id.). On January 19, 2007, plaintiff complained of migraines, neck pain, and shoulder pain. (Tr. 166). Dr. Lum administered a steroid injection and prescribed Lasix[30] and Flexeril.[31] (Tr. 166). On February 19, 2007, plaintiff complained of ear pain and depression. (Tr. 167). Dr. Lum diagnosed plaintiff with external otitis[32] and referred her for counseling. (Id.). On March 19, 2007, plaintiff complained of left knee pain and instability. (Tr.

---

[24]Reflux of blood through an incompetent aortic valve into the left ventricle during ventricular diastole. Stedman's at 1668.

[25]Reflux of blood through an incompetent mitral valve. Stedman's at 1668.

[26]Reflux of blood through an incompetent tricuspid valve. Stedman's at 1668.

[27]Inflammation of the mucous membrane of any sinus. Stedman's at 1777.

[28]Inflammation of the nasal mucous membrane. Stedman's at 1690.

[29]General term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. Stedman's at 554.

[30]Lasix is indicated for the treatment of high blood pressure. See WebMD, http://www.webmd.com/drugs (last visited July 26, 2011).

[31]Flexeril is indicated for the treatment of muscle spasms. See WebMD, http://www.webmd.com/drugs (last visited July 26, 2011).

[32]Inflammation of the external auditory canal. Stedman's at 1394.

168). Dr. Lum administered a corticosteroid injection and prescribed a Medrol Dosepak.[33] (Id.).

Plaintiff underwent an MRI of her left knee on March 28, 2007, which revealed chondromalacia[34] of the patella, but no tears or other abnormalities. (Tr. 216).

In a letter to Dr. Lum dated March 28, 2007, Andrew R. Baldassare, M.D., of Arthritis Consultants, Inc. indicated that plaintiff had psoriasis fairly extensively for five to six years. (Tr. 177). Dr. Baldassare stated that plaintiff also had a three-to-four-year history of pain in her knees, back, hips, feet, and hands, with nodular swelling in her hands and knees. (Id.). On physical examination, Dr. Baldassare noted marked plaque-like psoriasis in her upper and lower extremities and throughout her scalp. (Id.). Plaintiff's examination was otherwise negative. (Id.). Plaintiff had full grip strength but exhibited pain on motion of her cervical and lumbar spine. (Id.). Plaintiff's left knee was swollen and tender. (Id.). Dr. Baldassare instructed plaintiff in weight loss and exercises, and administered a corticosteroid injection to her left knee. (Id.).

In a letter to Dr. Lum dated April 30, 2007, Paul Maynard, M.D. stated that he had seen plaintiff with complaints of left knee pain on that date. (Tr. 257). Dr. Maynard indicated that he diagnosed plaintiff with patellofemoral syndrome.[35] (Id.). Dr. Maynard stated that he injected plaintiff's knee with a corticosteroid to relieve her pain. (Id.).

Plaintiff presented to Dr. Lum on July 13, 2007, with complaints of constant pain and requesting pain medication. (Tr. 110). Dr. Lum diagnosed plaintiff with psoriatic arthritis and

---

[33]Medrol is indicated for the treatment of allergic disorders, arthritis, blood diseases, breathing problems, and skin diseases. See WebMD, http://www.webmd.com/drugs (last visited July 26, 2011).

[34]Softening of the articular cartilage of the patella. Stedman's at 369.

[35]Anterior knee pain due to a structural or functional disturbance in the relation between the patella and distal femur. Stedman's at 1908.

prescribed Percocet.  (<u>Id.</u>).  On August 10, 2007, plaintiff complained of uncontrolled seizure activity.  (Tr. 111).  Dr. Lum prescribed Dilantin.  (<u>Id.</u>).  On September 11, 2007, plaintiff complained of cough and congestion.  (Tr. 112).  Dr. Lum diagnosed plaintiff with acute bronchitis.[36]  (<u>Id.</u>).  He noted that plaintiff's seizures had improved since she started the Dilantin.  (<u>Id.</u>).

Dr. Lum completed a Physical Residual Functional Capacity Questionnaire on October 2, 2007.  (Tr. 250-54).  Dr. Lum listed plaintiff's diagnoses as hypertension, seizure disorder, and psoriatic arthritis.  (Tr. 250).  Dr. Lum indicated that plaintiff experienced pain as a result of her impairments.  (<u>Id.</u>).  Dr. Lum identified the clinical findings and objective signs as left osteochondral changes, nodular swelling in hands and knees, aortic regurgitation, degenerative joint disease, and seizure activity.  (<u>Id.</u>).  Dr. Lum indicated that plaintiff suffered from the following psychological conditions: depression, anxiety, personality disorder,[37] and somatoform disorder.[38]  (<u>Id.</u>).  Dr. Lum found that plaintiff's pain or symptoms would interfere with her attention and concentration needed to perform even simple work tasks frequently.  (Tr. 251).  Dr. Lum indicated that plaintiff was incapable of even "low stress" jobs.  (<u>Id.</u>).  Dr. Lum expressed the opinion that plaintiff could walk less than one block without rest or severe pain; sit for thirty minutes; stand ten minutes, after which she would need to lie down or sit; could sit and stand less than two hours total in an eight-hour

---

[36]Inflammation of the mucous membrane of the bronchi.  <u>Stedman's</u> at 270.

[37]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired adjustment, affect, impulse control and interpersonal functioning.  <u>Stedman's</u> at 570.

[38]A group of disorders in which physical symptoms suggesting physical disorders for which there are no demonstrable organic findings or known physiologic mechanisms, and for which there is positive evidence, or a strong presumption that the symptoms are linked to psychological factors.  <u>Stedman's</u> at 571.

workday; requires several periods of walking around during a work-day; requires more than ten unscheduled breaks during a work-day; must elevate her legs with prolonged sitting; could never lift and carry any amount in a competitive work situation; could occasionally turn her head right or left, look up, and look down; could rarely stoop or bend; and could never hold her head in a static position, twist, crouch or squat, climb ladders, or climb stairs. (Tr. 253). Dr. Lum indicated that plaintiff's impairments are likely to produce good days and bad days and that plaintiff would likely be absent from work more than four days a month. (Id.). Dr. Lum stated that, due to psoriatic arthritis, plaintiff is losing the ability to function with her fingers and hand and that it is increasingly difficult for plaintiff to extend her fingers. (Tr. 254). Dr. Lum indicated that the earliest date that his findings applied was January 24, 2006. (Id.).

Plaintiff presented to Dr. Lum on November 6, 2007, with complaints of memory loss, seizure activity, fatigue, tiredness, and joint pain. (Tr. 115). Plaintiff's cardiovascular function was described as regular and her neurological function was described as non-focal.[39] (Id.). Dr. Lum diagnosed plaintiff with psoriatic arthritis and depression. (Id.). He prescribed Cymbalta, increased her Dilantin, and continued her Percocet. (Id.).

Plaintiff saw Dr. Baldassare on December 5, 2007, at which time she reported pain at a level of 10 on a scale of zero to ten. (Tr. 155). Dr. Baldassare diagnosed plaintiff with psoriatic arthritis. (Tr. 154). He prescribed medication, including Mobic. (Id.).

Plaintiff presented to Dr. Lum on December 6, 2007, at which time plaintiff complained of seizures, depression, and anxiety episodes. (Tr. 116). Dr. Lum noted that plaintiff was "talking to her dead relatives," and that she wanted Xanax to help her rest at night. (Id.). Dr. Lum prescribed

---

[39]Non-specific. Stedman's at 749.

Xanax and refilled plaintiff's Percocet.  (Id.).

Marsha Toll, PsyD., a state agency psychologist, completed a Psychiatric Review Technique on December 21, 2007.  (Tr. 188-97).  Dr. Toll found that plaintiff suffered from depression, that was not severe.  (Tr. 191).  Dr. Toll expressed the opinion that plaintiff's depression caused mild limitations in plaintiff's activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace.  (Tr. 195).

Plaintiff saw Ben W. Swink, D.O., a physician in Dr. Lum's office, on December 27, 2007, with complaints of sore throat, wheezing, and coughing.  (Tr. 117).  Dr. Swink noted that plaintiff had a mild seizure in the waiting room of his office.  (Id.).  Upon physical examination, plaintiff's cardiovascular function was normal; plaintiff had full range of motion in the extremities, with no muscular spasms; and plaintiff's neurological function was normal.  (Id.).  Dr. Swink's psychiatric examination revealed plaintiff to be alert and oriented times three, with a bright affect and cooperative.  (Id.).  Dr. Swink's assessment was bronchitis and sinusitis.  (Id.).  Dr. Swink recommended that plaintiff's Dilantin level be checked and that she follow-up with Dr. Lum in one week.  (Id.).

Plaintiff saw Dr. Lum on January 3, 2008, with complaints of continuous epilepsy.[40]  (Tr. 118).  Plaintiff reported that she was compliant with her Dilantin but Dr. Lum noted that plaintiff's levels were very low.  (Id.).  Plaintiff's physical examination revealed no abnormalities.  (Id.).  Dr. Lum's assessment was epilepsy, uncontrolled; rheumatoid arthritis; and anxiety.  (Id.).  Dr. Lum refilled plaintiff's Percocet, Xanax, and Dilantin; and added Tegretol.  (Id.).  He referred plaintiff to

---

[40]A chronic disorder characterized by paroxysmal brain dysfunction due to excessive neuronal discharge, and usually associated with some alteration of consciousness.  Stedman's at 655.

a neurologist.  (Id.).

Plaintiff saw Dr. Baldassare on February 6, 2008 for her psoriatic arthritis.  (Tr. 158).

Plaintiff presented at the SLUCare Dermatology Clinic on February 29, 2008, at which time she was diagnosed with psoriasis and psoriatic arthritis.  (Tr. 140).

Dr. Baldassare completed a Physical Residual Functional Capacity Questionnaire on March 18, 2008.  (Tr. 145-49).  Dr. Baldassare listed plaintiff's diagnosis as psoriatic arthritis.  (Tr. 145).  Dr. Baldassare listed plaintiff's symptoms as skin rash, joint pain, and fatigue.  (Id.).  Dr. Baldassare indicated that plaintiff also suffered from anxiety, which affected her physical condition.  (Id.).  Dr. Baldassare found that plaintiff's pain or other symptoms would interfere with the attention and concentration needed to perform even simple work tasks constantly.  (Tr. 146).  He indicated that plaintiff was incapable of even "low stress" jobs.  (Id.).  Dr. Baldassare found that plaintiff was unable to walk even one city block without rest or severe pain.  (Id.).  Dr. Baldassare found that plaintiff was able to sit for ten to fifteen minutes, and that plaintiff would need to walk after sitting this amount of time; stand for five minutes, after which plaintiff would need to walk or lie down; sit or stand for less than two hours total in an eight-hour workday; and lift less than ten pounds only rarely.  (Tr. 147-48).  Dr. Baldassare expressed the opinion that plaintiff could occasionally look up and down; rarely turn her head right or left and hold her head in a static position; and could never twist, stoop, crouch or squat, climb ladders, or climb stairs.  (Tr. 148).  Dr. Baldassare found that plaintiff needed to walk around every ten minutes for five minutes at a time, and that plaintiff needed a job that permits shifting positions at will from sitting, standing, or walking.  (Tr. 147).  He indicated that plaintiff needed to take unscheduled breaks to rest eight times during an average eight-hour workday for five to ten minutes at a time.  (Id.).  Dr. Baldassare also found that plaintiff had significant limitations with

reaching, handling, and fingering. (Tr. 148). Dr. Baldassare indicated that plaintiff's impairments are likely to produce good days and bad days, and that plaintiff would likely be absent from work more than four days a month. (Id.).

Plaintiff saw Dr. Lum on March 24, 2008, at which time she complained of nightmares, weakness, and diffuse joint and back pain. (Tr. 119). Dr. Lum noted that plaintiff had started a new injection for her psoriatic arthritis. (Id.). Upon physical examination, plaintiff had full range of motion of the extremities. (Id.). Plaintiff's neurological examination was also normal. (Id.). Plaintiff's psychiatric exam revealed plaintiff to be alert and oriented times three, with a bright affect, and cooperative. (Id.). Plaintiff's skin examination revealed some psoriasis on her elbows. (Id.). Dr. Lum's assessment was psoriatic arthritis, chronic back pain, degenerative joint disease,[41] and bipolar disorder.[42] (Id.). Dr. Lum recommended that plaintiff see a counselor. (Id.). He refilled plaintiff's Xanax and Percocet. (Id.).

Plaintiff saw Dr. Baldassare on April 9, 2008. (Tr. 125).

Plaintiff saw Dr. Lum on April 21, 2008, at which time she complained of hand pain and joint pain. (Tr. 120). Dr. Lum noted that plaintiff was seeing a neurologist and that a seizure study was planned at SLU the following month. (Id.). Plaintiff's musculoskeletal examination revealed full range of motion of the extremities. (Id.). Plaintiff's neurological and psychiatric examinations were also normal. (Id.). Dr. Lum noted that plaintiff's psoriatic plaque seemed stable. (Id.). Dr. Lum's

---

[41]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

[42]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. Stedman's at 568.

assessment was psoriatic arthritis, seizure disorder, and anxiety/depression. (Id.). He refilled plaintiff's Percocet and Xanax and continued the Cymbalta. (Id.).

Plaintiff underwent lumbar epidural steroid injections on May 2, 2008 at The Surgery Center of Farmington. (Tr. 130).

Plaintiff presented at the SLUCare Dermatology Clinic on May 9, 2008. (Tr. 142). Psoriatic plaque was observed on plaintiff's elbows and hands. (Id.). Plaintiff was diagnosed with psoriasis with arthritis. (Id.). The examining physician continued plaintiff on Humira.[43] (Id.).

Plaintiff underwent a lumbar epidural steroid injection on May 16, 2008, at The Surgery Center of Farmington. (Tr. 132).

Plaintiff saw Dr. Lum on May 19, 2008, at which time plaintiff's blood pressure was elevated. (Tr. 121). Plaintiff indicated that she had been compliant with her blood pressure medication. (Id.). Plaintiff's cardiovascular function was normal. (Id.). Plaintiff's musculoskeletal, neurological, and psychiatric examinations were also normal. (Id.). Dr. Lum recommended a cardiac work-up due to plaintiff's uncontrolled hypertension. (Id.). Dr. Lum noted that plaintiff had a history of mitral regurge, tricuspid regurge, and aortic regurge with ejection fraction[44] of fifty percent. (Id.). He continued plaintiff on Diovan and added Atenolol. (Id.).

Plaintiff underwent a lumbar epidural steroid injection on June 9, 2008. (Tr. 136).

Plaintiff saw Dr. Lum on June 16, 2008, at which time Dr. Lum noted that plaintiff's blood pressure had been up. (Tr. 122). Plaintiff's physical and psychiatric examinations revealed no abnormalities. (Id.). Dr. Lum noted that plaintiff was scheduled to undergo a seizure study the

---

[43]Humira is indicated for the treatment of psoriatic arthritis. See PDR at 442.

[44]The fraction of the blood contained in the ventricle at the end of diastole that is expelled during its contraction. Stedman's at 769.

following month.  (Id.).  He started plaintiff on Keflex, increased plaintiff's Atenolol, and continued the Lisinipril and Diovan.  (Id.).

Plaintiff saw Dr. Lum on July 11, 2008, for follow-up regarding her seizure disorder.  (Tr. 123).  Plaintiff complained of back pain.  (Tr. 123).  Dr. Lum noted that plaintiff was undergoing a seizure study the following week at SLU.  (Id.).  Dr. Lum performed a physical examination, which revealed no abnormalities.  (Id.).  Dr. Lum refilled plaintiff's medications.  (Id.).

Plaintiff was admitted to Saint Louis University Hospital on July 14, 2008, for evaluation regarding seizures.  (Tr. 106-08).  Plaintiff indicated that her first seizure occurred one year prior and that she was taken to the emergency department and diagnosed with encephalopathy[45] secondary to asthma.  (Id.).  Plaintiff reported having one to six seizures per day lasting thirty seconds to ten minutes, since that time.  (Id.).  Plaintiff indicated that most of the time, she is not confused after the seizure.  (Id.).  It was noted that plaintiff underwent a CT scan of the head in April 2007, an EEG in May 2007, and an MRI of the brain, all of which were normal.  (Id.).  Plaintiff's physical examination revealed no abnormalities.  (Tr. 106-07).  Plaintiff was admitted to the epilepsy monitoring unit for a video EEG telemetry.  (Tr. 107).  During her stay, plaintiff had multiple "typical events," all of which were associated with no change on EEG and indicated no epileptic events.  (Id.).  Plaintiff was discharged on July 17, 2008, with a diagnosis of non-epileptic seizures.  (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since November 9, 2007, the date the application for supplemental security income benefits was protectively filed (20 CFR 416.971 *et seq.*).

---

[45]Any disorder of the brain.  Stedman's at 636.

2.      The claimant has the following severe impairments: seizure disorder and psoriatic arthritis (20 CFR 416.921 *et seq*.). The claimant has the non-severe impairments of obesity, patellofemoral syndrome, hypertension, mildly enlarged left atrium with a trace of aortic regurgitation along with mild mitral and tricuspid regurgitation, asthma, depression, and anxiety.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except that the claimant is able to lift/carry/push/pull ten (10) pounds occasionally and less than ten (10) pounds frequently; can sit for six (6) hours of an eight (8) hour workday and can stand/walk for two (2) hours of an eight (8) hour workday for a total of eight (8) hours of an eight (8) hour workday; the claimant is limited to only occasional climbing, balancing, stooping, crouching, kneeling, or crawling; the claimant cannot be exposed to ladders, ropes, scaffolds, moving machinery, or unprotected heights; the claimant cannot endure concentrated exposure to extreme cold, vibration, dust, fumes, gases, and chemicals.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant, who was born on December 22, 1975, was thirty-one (31) years old, which is defined as a "younger individual," on the date the application for supplemental security income benefits was protectively filed (20 CFR 416.963).

7.      The claimant has obtained her high school diploma. The claimant is able to communicate in English (20 CFR 416.964).

8.      Transferability of skills is not material because the claimant is a younger individual.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since November 9, 2007, the date the application for supplemental security income benefits was protectively filed (20 CFR 416.920(g)).

(Tr. 17-28).

The ALJ's final decision reads as follows:

> Based on the application for supplemental security income protectively filed on November 9, 2007, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 28).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.      The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity.  Specifically, plaintiff contends that the ALJ failed to point to medical opinion evidence to support his determination.  Plaintiff also contends that, in determining plaintiff's residual functional capacity, the ALJ erred in discrediting the opinions of Drs. Lum and Baldassare. Plaintiff also argues that the hypothetical question posed to the vocational expert was inadequate.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel,

245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> Therefore, after careful consideration of the entire record, the undersigned finds that due to the claimant's "severe" impairments of a seizure disorder and psoriatic arthritis, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except that the claimant is able to lift/carry/push/pull ten (10) pounds occasionally and less than ten (10) pounds frequently; can sit for six (6) hours of an eight (8) hour workday and can stand/walk for two (2) hours of an eight (8) hour workday for a total of eight (8) hours of an eight (8) hour workday; the claimant is limited to only occasional climbing, balancing, stooping, crouching, kneeling, or crawling; the claimant cannot be exposed to ladders, ropes, scaffolds, moving machinery, or unprotected heights; and the claimant cannot endure concentrated exposure to vibration. In addition, due to the claimant's "non-severe" impairment of asthma, the undersigned finds that the claimant cannot endure concentrated exposure to extreme cold, dust, fumes, gases, and chemicals. The undersigned finds that based upon the totality of the objective medical evidence of record and after a careful consideration of the entire record, the claimant's remaining "non-severe" impairments result in no further significant long-term functional limitations.

(Tr. 26-27).

In support of his residual functional capacity determination, the ALJ first discussed plaintiff's credibility and found that plaintiff's subjective complaints were not credible, a finding that plaintiff does not challenge. (Tr. 24-25). With respect to the medical opinion evidence, the ALJ indicated that he was according "significant weight" to the opinion of state agency

psychologist Dr. Toll, who expressed the opinion that plaintiff's alleged mental impairments were "non-severe." (Tr. 26). The ALJ stated that he was giving "little weight" to the opinion of plaintiff's primary care physician, Dr. Lum. (Id.). The ALJ also indicated that he was according "little weight" to the opinion of plaintiff's primary care physician, Dr. Baldassare. (Id.). Finally, the ALJ noted that he gave "little weight" to the opinion of the lay person state agency disability examiner. (Id.).

Plaintiff argues that, in determining plaintiff's residual functional capacity, the ALJ erred in discrediting the opinions of Drs. Lum and Baldassare. In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Drs. Lum and Baldassare each completed a Physical Residual Functional Capacity

Questionnaire, in which they expressed the opinion that plaintiff had extensive functional limitations. Significantly, the limitations found by Drs. Lum and Baldassare are more restrictive than the limitations found by the ALJ in his residual functional capacity determination.

With regard to Dr. Lum, the ALJ indicated that he was according little weight to his opinion because it conflicts with Dr. Lum's own treatment notes, including both physical examination and mental status examinations conducted since September 21, 2007. (Tr. 26). The ALJ also pointed out that Dr. Lum noted in his October 2, 2007 opinion that plaintiff's prognosis was undetermined. (Tr. 145). The ALJ stated that Dr. Lum's subsequent treatment notes indicated that plaintiff's conditions appear to have improved since Dr. Lum's October 2, 2007 opinion. (Tr. 26).

The ALJ erred in discrediting the opinion of Dr. Lum. Dr. Lum was plaintiff's treating physician and treated plaintiff regularly since August 2006. Dr. Lum diagnosed plaintiff with psoriatic arthritis, seizure disorder, and hypertension, and treated various acute conditions. Dr. Lum indicated that his opinion was based on plaintiff's diagnoses of psoriatic arthritis, seizure disorder and hypertension and that plaintiff's impairments caused plaintiff to experience pain. Dr. Lum regularly noted plaintiff's complaints of pain and consistently prescribed Percocet, a narcotic pain reliever. Although Dr. Lum routinely found no abnormalities upon musculoskeletal examination as defendant points out, this alone is not inconsistent with Dr. Lum's findings, as Dr. Lum's opinion was based on plaintiff's combined impairments of psoriatic arthritis, seizure disorder, and hypertension.

In discrediting Dr. Lum's opinion, the ALJ also stated that plaintiff's condition appeared to improve after October 2, 2007. The record, however, does not support this finding. Rather,

the record reveals plaintiff continued to complain of seizures, joint pain, and back pain. In fact, plaintiff's seizure activity appeared to increase, resulting in Dr. Lum diagnosing plaintiff with "uncontrolled epilepsy" on January 3, 2008. (Tr. 118). The record indicates that plaintiff's hypertension also worsened. On May 19, 2008, Dr. Lum recommended a cardiac work-up due to plaintiff's "uncontrolled hypertension." (Tr. 121).

With regard to Dr. Baldassare, the ALJ stated that he was according little weight to his opinion because the opinion conflicts with the objective medical evidence of record and the treatment notes of Dr. Baldassare himself since September 21, 2007, plaintiff's alleged onset date. (Tr. 26). The ALJ also stated that, because Dr. Baldassare is a rheumatology expert, his opinion regarding any mental impairment is outside his field of expertise and is given little weight as well. (Id.).

The ALJ erred in discrediting the opinion of Dr. Baldassare. Dr. Baldassare was a treating physician and an expert in rheumatology, as the ALJ pointed out. Plaintiff saw Dr. Baldassare on a regular basis for treatment of her psoriatic arthritis. Although the ALJ found that Dr. Baldassare's opinion conflicted with the objective evidence of record and Dr. Baldassare's own treatment notes, he failed to set out any inconsistencies. Dr. Baldassare consistently diagnosed plaintiff with psoriatic arthritis and noted plaintiff's complaints of pain. On March 28, 2007, Dr. Baldassare noted plaque-like psoriasis on plaintiff's upper and lower extremities and scalp, pain on motion of her cervical and lumbar spine, and a swollen and tender left knee. (Tr. 177). Dr. Baldassare's handwritten treatment notes are difficult to read and in many instances illegible. No inconsistencies, however, are apparent in Dr. Baldassare's treatment notes and the ALJ failed to identify inconsistencies. If the ALJ had any questions, he should have sought clarification from

Dr. Baldassare.  Significantly, Dr. Baldassare's opinion was consistent with the opinion of plaintiff's other treating physician, Dr. Lum.

The undersigned finds that the ALJ's residual functional capacity determination is not supported by substantial evidence.  The ALJ did not provide a rationale for his residual functional capacity nor did he cite any medical opinions supporting his determination.  The ALJ improperly rejected the opinions of both of plaintiff's treating physicians, Drs. Lum and Baldassare.  After rejecting the opinions of Drs. Lum and Baldassare, there is no opinion from any physician, treating or consulting, regarding plaintiff's ability to function in the workplace with her physical impairments.  As such, there is no medical evidence in the record suggesting that plaintiff can, or cannot, perform a limited range of sedentary work.  The residual functional capacity must be based on some medical evidence; if there is no such evidence, the residual functional capacity "cannot be said to be supported by substantial evidence."  Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace.  See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  Here, the ALJ's physical residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence.  See Lauer, 245 F.3d at 703.

The hypothetical question posed to the vocational expert was based on this erroneous residual functional capacity.  As such, the hypothetical question was not supported by substantial evidence.

Accordingly, the undersigned recommends that this matter be reversed and remanded to

the ALJ in order for the ALJ to accord the proper weight to the opinions of Drs. Lum and Baldassare and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record. If necessary, the ALJ should obtain additional medical evidence that addresses plaintiff's ability to function in the workplace.

### RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this  17th  day of August, 2011.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE